**Janet Schrader BENNETT, Plaintiff,**

v.

**The PROGRESSIVE CORPORATION, Progressive Casualty Insurance Company, Larry Mitchell, John Barbagallo, and Michael Beney, Defendants.**

**No. 00–CV–0286.**

United States District Court,
N.D. New York.

Sept. 26, 2002.

---

Law Offices of Harry R. Hayes, Albany, New York, for plaintiff, Harry Hayes, of counsel.

Hancock & Estabrook, LLP, Syracuse, New York, for defendant Larry Mitchell, Michael J. Sciotti, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for defendants The Progressive Corporation, Progressive Casualty Insurance Company, John Barbagallo,

and Michael Beney, Louis D. Dilorenzo, Gretchen White, of counsel.

## *MEMORANDUM–DECISION AND ORDER*

HURD, District Judge.

## I. *INTRODUCTION*

Plaintiff Janet Schrader Bennett ("plaintiff") brought suit against defendants, The Progressive Corporation ("Progressive"), Progressive Casualty Insurance Company ("Progressive"),[1] Larry Mitchell ("Mitchell"), Michael Beney ("Beney"), and John Barbagallo ("Barbagallo"), alleging in her Amended Complaint ten causes of action.

In plaintiff's *first* cause of action, she alleges, as against all of the above defendants, that the actions of Mitchell, her supervisor, including his unwelcome sexual advances, requests for sexual favors, unwanted touching, hugging and kissing of plaintiff, retaliatory actions against plaintiff on occasions when plaintiff attempted to ignore his unwanted advances, threats to plaintiff about reporting his behavior, and his forcing and coercing plaintiff against her will to engage in sexual intercourse, constitute the creation of a hostile work environment and discrimination on the basis of sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended 42 U.S.C. §§ 2000e *et seq.*

In plaintiff's *second* cause of action, she alleges, as against all of the above defendants, that the actions of Mitchell, using his position as plaintiff's supervisor to retaliate against plaintiff when plaintiff attempted to ignore his unwelcome sexual advances while ceasing and desisting such retaliatory conduct when plaintiff did not resist such sexual advances, constitute quid quo pro sexual harassment and dis-

crimination on the basis of sex in violation of Title VII.

In plaintiff's *third* cause of action, she alleges, as against all defendants, she was discharged in retaliation for lodging a sexual harassment complaint against Mitchell, in violation of Title VII, 42 U.S.C. §§ 2000e–3(a).

In plaintiff's *fourth* cause of action, she alleges, as against all defendants, that the actions of Mitchell, her supervisor, including his unwelcome sexual advances, requests for sexual favors, unwanted touching, hugging and kissing of plaintiff, retaliatory actions against plaintiff on occasions when plaintiff attempted to ignore his unwanted advances, threats to plaintiff about reporting his behavior, and his forcing and coercing plaintiff against her will to engage in sexual intercourse, constitute the creation of a hostile work environment and discrimination on the basis of sex in violation of New York Human Rights Law ("NYHRL"), N.Y.Exec. Law §§ 290 *et seq.*

In plaintiff's *fifth* cause of action, she alleges, as against all defendants, that the actions of Mitchell, using his position as plaintiff's supervisor to retaliate against plaintiff when plaintiff attempted to ignore his unwelcome sexual advances while ceasing and desisting such retaliatory conduct when plaintiff did not resist such sexual advances, constitute quid quo pro sexual harassment and discrimination on the basis of sex in violation of NYHRL.

In plaintiff's *sixth* cause of action, she alleges, as against all defendants, she was discharged in retaliation for lodging a sexual harassment complaint against Mitchell, in violation of NYHRL, N.Y.Exec.Law § 296(3–a)(c).

---

1. In its moving papers, defendants referred to The Progressive Corporation and Progressive Casualty Insurance Company as "the Progres-

sive defendants." This opinion will also not distinguish between the two, and refer to them collectively as "Progressive."

In plaintiff's *seventh* cause of action, she alleges, as against defendants Mitchell, Beney, and Barbagallo personally, that the actions of Mitchell, in committing the above acts, and the actions of Beney and Barbagallo, as superiors to Mitchell, in conducting an ineffective sexual harassment investigation and in unlawfully terminating plaintiff's employment, constitute aiding and abetting a NYHRL violation pursuant to N.Y.Exec.Law § 296(6).

In plaintiff's *eighth* cause of action, she alleges, as against all defendants, that the conduct of Mitchell, Beney, and Barbagallo amounts to intentional infliction of emotional distress in violation of New York State law.

In plaintiff's *ninth* cause of action, she alleges, as against Progressive only, she worked in excess of forty hours a week during her employment, and has received no overtime compensation, in violation of the Fair Labor Standards Act, 29 U.S.C. §§ 207(e).

In plaintiff's *tenth* cause of action, she alleges, as against Progressive only, she worked in excess of forty hours a week during her employment, and has received no overtime compensation, in violation of Section 663 of New York Labor Law.

Plaintiff has stipulated to the dismissal of all causes of action against Mitchell, Beney, and Barbagallo, with the exception of the *seventh* cause of action, for aiding and abetting a violation of NYHRL.[2] (Stipulation and Order, Docket nos. 30, 16). Plaintiff has also stipulated to the dismissal of the *eighth* cause of action, for intentional infliction of emotional distress, as against all defendants. (Stipulation and Order, Docket nos. 16, 14).

All defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Oral argument was heard on July 26, 2002 in Albany, New York, and decision on the motions was reserved.

## II. *FACTUAL BACKGROUND*

Taken in the light most favorable to plaintiff, the following comprise the facts necessary to deciding this motion.

In January of 1997, plaintiff was hired as a claims representative in the Albany, New York office of Progressive. Her immediate supervisor in the Albany office was Steven DeHart. During plaintiff's first few weeks of employment, she received training and a "training box" containing materials designed to familiarize employees with company procedure and to give them other information Progressive deems relevant. Progressive contends that contained in such boxes are copies of "The Progressive Way," a manual on policies. Included in "The Progressive Way" is an anti-sexual harassment policy, as well as an "open door policy" and a section informing employees of an "alertline" they can call if they have a grievance against another employee or supervisor. Neither the "open door policy" nor the "alertline" are specifically tailored to solely apply to sexual harassment, and "The Progressive Way" contains no specific complaint procedure dealing with only sexual harassment.

Plaintiff claims she did not receive a copy of "The Progressive Way." Her supervisor does not recall giving her or seeing her with a copy of the document, nor does he recall anyone else giving her a copy. Plaintiff was given two tests during the training period, but it is unclear what

---

**2.** *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1317 (2d Cir.1995) (holding that individuals cannot be held personally liable for either Title VII or NYHRL sexual harassment or hostile work environment violations), *abrogated on other grounds, Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

material was tested. She did know there existed a general reference source in the Albany office entitled "The Progressive Way," but believed it contained benefits information. Although plaintiff was aware of Progressive's human resources department, she was not aware of the company sexual harassment policy.

In September of 1997, plaintiff was offered a transfer to a claims representative position in Progressive's Utica office. She accepted and in November of 1997 began working in Utica. There is some amount of dispute as to plaintiff's duties as a claims representative. According to plaintiff, since Progressive's main business function in its Utica office was to process claims, and since claims representatives were not permitted to create and sell actual insurance policies, her duties largely comprised of processing claims under automobile insurance policies. Progressive, on the other hand, describes plaintiff's position as encompassing a broad range of activities, including making determinations as to whether insurance coverage applies to claims, making decisions whether or not to investigate accidents, investigating liabilities of accidents, evaluating accident injuries and damages, negotiating settlements of claims with the claimant and his or her attorney, deciding whether to investigate potential fraud and conducting such investigations, handling the salvaging of vehicles, and "even ... acting on behalf of Progressive at trial." (The Progressive Defendants' Statement of Undisputed Facts, at 12, ¶ 47).

Plaintiff's supervisor in the Utica office was Larry Mitchell. Mitchell's supervisor was Michael Beney, who worked for Progressive out of Syracuse. Mitchell and Beney were close personal friends. Beney was also a friend of Mitchell's wife, and served as an usher in Mitchell's wedding. Beney's superior was John Barbagallo, the regional general manager for Progressive's central New York operations.

Sometime after plaintiff transferred, she perceived the running and operation of the Utica office to be far inferior to that of the Albany office. Because of this, she even considered returning to Albany. Nevertheless, she remained and made suggestions to Mitchell about how to improve the efficiency of the office, and she claims some changes were in fact made. She began to work long hours to aid in the implementation of the changes, sometimes staying in the office until 9:00 in the evening with Mitchell. Other employees in the Utica office were less than fond of the negative comparisons between offices, and became hostile to plaintiff. Plaintiff has described the atmosphere in the office to be a "terrible working environment." (Depo. of J. Bennett, at 357). Concerned over co-worker hostility towards her, plaintiff looked to Mitchell for protection, who she believed shared her business views. Occasionally, Mitchell intervened to stop the hostility.

Within one to two months after plaintiff's transfer to the Utica office, Mitchell began to comment on her appearance, including comments about her looks in general, her clothes, her perfume, and how she looked in particular outfits. Mitchell also began to place his hands on plaintiff's shoulders while she worked at her desk. Largely distressed by the conduct, plaintiff attempted to initially ignore it. This conduct, according to plaintiff, worsened with time. When plaintiff was working late with Mitchell, he initiated conversations with her about his personal life, including his sexual relationship with his wife. She claims he told her his wife was not satisfying him physically. One evening, Mitchell's wife phoned the office, and plaintiff heard Mitchell explain to his wife that he was on the road working with another

Progressive employee. Mitchell explained his prevarication by telling plaintiff that she was his wife's "enemy" and that lying about being at the office alone with plaintiff was necessary.

Also during this time period, Mitchell increased plaintiff's work load, and at least some of the work was beyond her training and expertise. This caused plaintiff to continue working late during the week and on the weekends with Mitchell. While still speaking to plaintiff about his difficulties with his wife, Mitchell began to ask plaintiff about her personal life, including questions about her sexual activities and her relationship with her boyfriend. He claimed they had a lot in common.

In February of 1998, around three months after plaintiff transferred to the Utica office, Mitchell arranged to drive plaintiff to a Syracuse salvage yard for training she needed to succeed on an "outside road adjuster" exam that plaintiff was to take in March. Plaintiff's career track at Progressive was to become an outside road adjuster, a position involving significant time outside the office estimating vehicle damage. On the drive back to Utica, Mitchell and plaintiff stopped at a restaurant for dinner. Such meals were not uncommon when traveling in connection with Progressive business. During dinner, Mitchell again without provocation began discussing his personal life with plaintiff. He told plaintiff he was unhappy with his marriage, and that he wanted a relationship with plaintiff beyond that shared by ordinary colleagues.

Though this caused plaintiff more distress, she did nothing. Plaintiff's father was ill, her mother had recently lost her job, and her brother had moved in with her after losing his home. The financial constraints of supporting her family and herself necessitated her keeping the Progressive job. In addition, plaintiff claims knowledge at that time of another instance

where Mitchell had personal animosity towards another Progressive employee and increased his work load to such an extent that the employee resigned. Thus, though her family advised her to quit, plaintiff continued to try and ignore Mitchell's behavior.

Plaintiff did, however, try to distance herself from Mitchell. Mitchell responded by making her job less bearable. He would refuse to answer work-related questions she posed, delay projects plaintiff was working on, and cease intervening in intra-office disputes between plaintiff and other employees in the Utica office. When plaintiff narrowed the "distance" between them, he reciprocated by refraining from the above activities, but when she sensed him pursuing the same line of inappropriate conduct, he did not. He began leaving plaintiff sexually suggestive poems at her desk, a practice that continued for some months. Plaintiff was convinced Mitchell would continue this behavior if she resisted his attempts to transform their relationship into a physical one.

Also in early 1998, Mitchell, claiming a desire to talk about work with her, began to pressure plaintiff into taking drives with him during work hours. During these car trips, Mitchell would stop the vehicle and retrieve alcohol from the trunk. If plaintiff resisted his attempts to coerce her into drinking, he would become angry. She would sometimes agree to have a drink, only to pour out the beverage when Mitchell was not watching. Mitchell intimated that he was her "only protection" in the Utica office. This caused plaintiff further distress, and her family and friends began to notice the emotional problems she was having.

Mitchell began to arrange plaintiff's work load so that they would be in the Utica office alone at the end of work days. The pressure to make plaintiff drink alco-

hol surfaced again during these times. He would arrive at her desk without warning, brandishing alcohol. Plaintiff informed Mitchell that drinking alcohol was never done in the Albany office. Mitchell responded, in effect, that he was in charge of the Utica office and that he could do as he wished. In the effort to convince plaintiff to drink alcohol, Mitchell would speak of his personal life, place his hands on plaintiff, and attempt to hug and kiss her. Plaintiff believed Mitchell was trying to force her to drink so that she would be more amenable to a physical relationship. Plaintiff did occasionally submit to his demands that she drink in the office, but she also claims she often poured out the beverage when Mitchell was not looking.

Mitchell then began placing telephone calls to plaintiff at home. He would ask plaintiff to take vacation time and spend time with him. Plaintiff considered lodging a complaint to Beney, but did not due to her knowledge of Mitchell's close relationship with Beney, and Mitchell's statement that Beney pushed out Mitchell's predecessor in order to employ Mitchell in the same position. Plaintiff believed that lodging said complaint put her job in jeopardy. As a result, plaintiff submitted to Mitchell's persistent efforts to hug and kiss her in the office.

By June of 1998, Mitchell's behavior had become so unbearable that plaintiff began calling in sick to work just to avoid it, staying home the entire first week of June. Plaintiff claims she told Mitchell that she would be forced to resign if he continued his behavior. She claims he apologized, told her he would cease his efforts, and that a working relationship would be their sole connection. Around this time, plaintiff arrived at work one day to find that Mitchell had made a schedule entry for her to take her father to a doctor's appointment in the afternoon. Mitchell talked her into going for another drive to discuss changes in the office. On the drive there was no work-related discussion, and after stopping at a restaurant for lunch, Mitchell asked plaintiff if she would like to stay in a hotel room with him. She refused. Nonetheless, on the way back to Utica, Mitchell repeatedly asked plaintiff to stay with him in hotels they were passing on the road, again indicating a desire to elevate their relationship. She refused again, citing her relationship with her boyfriend and the recent conclusion of her unfriendly divorce. She pleaded with Mitchell to stop his efforts. This caused her further distress.

She again considered lodging a complaint, but did not for the same reasons as before. Plaintiff did, however, place a phone call to Albany and inquire about a marketing position in the Albany office. Mitchell became aware of this, and informed plaintiff he would help her obtain the position if she agreed to a personal relationship with him. In the meantime, plaintiff became engaged to her boyfriend.

Plaintiff again tried to keep her distance from Mitchell. When she did, he would ignore her in the office when she posed work-related questions. Mitchell had informed plaintiff of his past infidelities, and that the affairs in those cases were never more than physical relationships. Plaintiff believed this to be the case with her, and in the face of Mitchell's continued pressure, and fearful of losing her job, plaintiff finally submitted and had sexual intercourse with Mitchell in early summer of 1998. Though they had sexual intercourse twice, plaintiff stopped the act on the second occasion and left Mitchell in the room. After plaintiff's submission to Mitchell, he became more aggressive. He would grab and kiss her in the office. He was also incensed about plaintiff's engagement to her fiancé, and would make derogatory comments about him to plaintiff. When plaintiff's fiancé called, Mitchell would

leave the office and return only after everyone but plaintiff remained.

Plaintiff agreed to meet with Mitchell at a restaurant in August of 1998. At this meeting, plaintiff wished to again advise Mitchell that she would report his behavior if he did not stop his efforts at elevating their relationship. When plaintiff arrived at the meeting, it was apparent Mitchell was intoxicated, and plaintiff decided to abort her plan. Plaintiff exited the restaurant and was allegedly attacked by Mitchell's wife.

The following day she was unable to work and called in sick due to stomach problems caused by distress. Mitchell called her and drove by her house. Plaintiff confronted Mitchell outside of the house and begged him to stop, telling him she was on the verge of a nervous breakdown, it was not proper behavior for a manager, that she was soon to be married, and that if he did not cease a complaint would be filed. He tried to calm plaintiff down and then informed her that lodging a complaint would result in her career at Progressive being over because of his relationship with Beney. He informed her he would "spit on her grave" and that he would watch her "go down" without admitting to any wrongdoing.

Plaintiff was fearful of reporting Mitchell's behavior to Beney, so she explained the situation in general terms to a Syracuse office claims representative she met in the course of work. Plaintiff claims this employee, Joanne Weimeier ("Weimeier"), told her that she had heard a rumor of an affair between Mitchell and a "claims assistant" that started before plaintiff worked in Utica. According to plaintiff, Weimeier advised plaintiff against reporting the behavior to Beney, since he and Mitchell were friends, and that she would find someone else for plaintiff to talk to about Mitchell.

Also in August of 1998, after hiring a private investigator, plaintiff arranged to meet with Mitchell. At the behest of the investigator, plaintiff concealed a tape recorder to capture their conversations. When plaintiff arrived at the restaurant, it was apparent to her Mitchell was intoxicated. He tried to reach under the table and place his hand on plaintiff's leg in an effort to hold her hand. She became upset, began screaming at Mitchell, and exited the restaurant. Mitchell followed her into the parking lot, begging her to return inside. She refused. After Mitchell, in the days and weeks following this incident, repeatedly drove by her house and called her, plaintiff felt she had no option but to report the behavior to Beney.

On September 9 or 10, 1998, plaintiff met with Beney in his office in Syracuse. Plaintiff told Beney she was having personal problems with Mitchell, that working conditions were poor in the Utica office, and that she wanted Beney to speak to Mitchell. Beney told her to go home for the day. Before she left, he placed a phone call to Mitchell and set up a meeting with him the next day. He told plaintiff he would speak to her after that. Beney called Human Resources employee Veronica Buttacavoli ("Buttacavoli") and asked her how to proceed.

On September 11, 1998, Beney and Mitchell met. Mitchell informed Beney that he and plaintiff had a consensual personal relationship but that it had ended by mutual agreement. That same day, Beney drove to Syracuse and took plaintiff to lunch. During lunch, he relayed what Mitchell had told him. Plaintiff indicated she did not wish to speak any more before calling her fiancé, who was an attorney. After her conversation with her fiancé, plaintiff called Beney and arranged to meet with him the next day.

On September 12, 1998, plaintiff met with Beney in Syracuse and gave him the details of Mitchell's behavior. She told Beney that the relationship was not consensual, that she occasionally submitted to Mitchell's pressure to get her to drink alcohol at work against her will, but that she never brought the alcohol into the office. Plaintiff told Beney about the poems and her attempts to tape record conversations. After hearing the details, Beney apologized to plaintiff and reassured her that Mitchell would no longer be her manager. Plaintiff claims she was told by Beney that she had a long career ahead of her at Progressive, and was given a telephone number, the alertline number, to call if she had further problems. Plaintiff was scheduled to go to Tampa, Florida the following day for training. Beney told plaintiff to go to Tampa.

Two days after the meeting, on September 14, 1998, Beney turned the matter over to Buttacavoli. The Human Resources employee had begun working for Progressive four or five months earlier, and had never before investigated a sexual harassment complaint. Beney had also never investigated a sexual harassment complaint. The record is unclear as to the extent of Barbagallo's experience with sexual harassment complaints.

On September 15, 1998, Buttacavoli interviewed plaintiff's co-workers in the Utica office. That same day, plaintiff alleges she received a phone call from Beney while she was in Florida. During the conversation, Beney told her again that the situation was under control. Plaintiff was under the impression that Mitchell was no longer working for Progressive and that Beney was now in charge. According to plaintiff, Beney told her that he was speaking to her co-workers and that he had spoken to his supervisor, Barbagallo.[3]

The following day, September 16, 1998, Buttacavoli interviewed Mitchell. The same day, plaintiff, while still in Florida, had a phone conversation with Weimeier, the Syracuse office claims representative, during which she claims Weimeier told her Mitchell was still working in Utica, that there was a rumor of a lawsuit, and that Progressive was trying to find a way to dispose of plaintiff. Plaintiff immediately called Beney, who informed her that Mitchell was indeed still working in the Utica office, but denied Progressive was trying to find a way to fire her.

On September 17, 1998, Buttacavoli, from Human Resources, arrived in Florida to interview plaintiff. Plaintiff reiterated what she had told Beney of Mitchell's behavior. When plaintiff informed Buttacavoli that Mitchell was still working in Utica, Buttacavoli was, according to plaintiff, surprised. Plaintiff then told Buttacavoli of the threats she received from Mitchell regarding the reporting of his conduct, and was told not to worry, that the company was there to help plaintiff.

The next day, plaintiff left Florida and attempted to reach Beney and Buttacavoli by phone. She was not successful. Buttacavoli had concluded her four-day investigation and was presenting her findings via conference call to Steve Garfunkel, an attorney for Progressive, Beney, Barbagallo, and Letitia Linker, Buttacavoli's supervi-

---

**3.** According to Progressive, Barbagallo actually became aware that there was a situation as early as September 8 or 9, 1998, after Mitchell told Beney that he and plaintiff had a consensual relationship. Prior to speaking with Mitchell, Beney alleges that plaintiff called him and informed him of her desire to speak to him about something. According to Progressive, after Beney called Mitchell to ask if he knew what plaintiff wished to speak to him about, and Mitchell eventually admitted to a "consensual" relationship, Beney phoned Barbagallo for advice on how to proceed. Barbagallo and Beney agreed to simply wait and see what plaintiff had to say before taking any action.

202

sor. The assembled Progressive employees determined that plaintiff's claim of sexual harassment was without merit.

Plaintiff was finally able to speak with Beney by telephone on September 20, 1998. According to plaintiff, Beney led her to believe that he had corrected her problem with Mitchell, and told her to meet him at the Utica office the following day. On September 21, 1998, Beney escorted her into a conference room in the Utica office, where he and Barbagallo informed her she was fired for violating Progressive's alcohol policy ("the alcohol policy"). The alcohol policy provided for mandatory termination for any employee who consumes alcohol at work. Mitchell was also terminated. Nothing was said to plaintiff regarding the sexual harassment investigation. In connection with the terminations, Beney prepared termination notification forms for both Mitchell and plaintiff. The space reserved for the reason for termination, called the "reason code," was left blank on both forms.

On June 7, 1999, plaintiff filed administrative charges of sexual discrimination and retaliation with the United States Equal Employment Opportunity Commission ("EEOC"), and with the State Division of Human Rights. On December 17, 1999, the EEOC issued a Notice of Right to Sue to plaintiff. On April 14, 2000, the State Division of Human Rights issued an Order dismissing plaintiff's charge for administrative convenience. Plaintiff filed the instant lawsuit on February 14, 2000.

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. *See* Fed.R.Civ.P. 56;

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 436 (2d Cir.1999). The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact. *See* Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Richardson*, 180 F.3d at 436; *Project Release v. Prevost*, 722 F.2d 960, 968 (2d Cir.1983).

Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Liberty Lobby, Inc.*, 477 U.S. at 250, 106 S.Ct. 2505; *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. Courts have urged care in reviewing discrimination claims, noting that "[b]ecause direct evidence of ... discriminatory intent will rarely be found, 'affidavits and depositions must carefully be scrutinized for circumstantial proof which, if believed, would show discrimination.' " *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (quoting *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994). Nevertheless, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S.Ct. 1348; *see also Schwapp*, 118 F.3d at 110 ("[e]ven in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment."). To

withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *See Liberty Lobby, Inc.,* 477 U.S. at 248–49, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348. Conversely, "summary judgment is appropriate only where application of the law to those undisputed facts will reasonably support only one ultimate conclusion." *Richardson,* 180 F.3d at 438.

### B. *Quid Pro Quo Harassment / Hostile Work Environment*

■ In plaintiff's *first, second, fourth,* and *fifth* causes of action, she alleges quid pro quo sexual harassment and the creation of a hostile work environment in violation of both Title VII and NYHRL. For the purposes of whether such claims have merit, there is no need to distinguish between "hostile work environment" and "quid pro quo" sexual harassment. *Yerry v. Pizza Hut of Southeast Kansas,* 186 F.Supp.2d 178, 183 (N.D.N.Y.2002) (citing *Gregory v. Daly,* 243 F.3d 687, 698 (2d Cir.2001)). "[T]hese labels, to the extent they are useful at all, are so merely as descriptions of varying workplace conditions that violate Title VII's basic prohibition on sex discrimination in terms or conditions of employment." *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 751–52, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

"Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult," *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), and "[r]equiring an employee to engage in unwanted sex acts is one of the most pernicious and oppressive forms of sexual harassment that can occur in the workplace." *Jin v. Metropolitan Life Ins. Co.,* 295 F.3d 335, 344–45 (2d Cir.2002) (citing *Harris vs. Forklift Systems, Inc.,* 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), and noting that the Court called such conduct "appalling" and "especially egregious"). To prevail on her Title VII claim, plaintiff must prove that she is a member of a protected class, that she was subjected to unwelcome advances by her supervisor, that such harassment was based upon her sex, and that it affected a term, condition, or privilege of her employment.[4] *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1042 (2d Cir.1993). Such proof involves both subjective and objective components. *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 765 (2d Cir. 1998).

■ Because the defendants, for the purposes of summary judgment, have conceded that Mitchell's conduct satisfies these substantive elements, plaintiff must establish some basis for imputing liability to Progressive for the unlawful conduct of its employees. *See Meritor Savings Bank,* 477 U.S. at 72, 106 S.Ct. 2399. Though determination of whether a substantive sexual harassment violation has occurred is the same under Title VII and NYHRL, the standards governing imputation of liability to the employer differ. *See, e.g., Dyke v. McCleave,* 79 F.Supp.2d 98, 102 (N.D.N.Y.2000) (collecting cases); *Rivera v. Prudential Ins. Co. of America,* Nos. 95–CV–0829, 95–CV–0830, available at 1996 WL 637555, at *12 (N.D.N.Y.1996) (noting also that summary judgment may not be appropriate under Title VII, but may be under NYHRL).

---

4. Hostile work environment/quid pro quo harassment claims brought under NYHRL must pass muster under an identical standard. *Martin v. New York State Dept. of Cor-* *rectional Services,* 115 F.Supp.2d 307, 311 (N.D.N.Y.2000) (citing *Tomka,* 66 F.3d at 1304 n. 4).

### 1. *Progressive's Liability under Title VII*

Under Title VII, where the perpetrator of the harassment was the victim's supervisor, an employer is presumed responsible. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Leopold v. Baccarat, Inc.*, 239 F.3d 243 (2d Cir.2001). Once it is assumed that sex discrimination has occurred, agency law principles, and not the specific cause of action framed by a plaintiff, are what give rise to the presumption. *Jin*, 295 F.3d at 342 (citing *Ellerth*, 524 U.S. at 754, 118 S.Ct. 2257). In other words, the presumption of employer liability does not automatically arise. The perpetrator must have not only been using his position as a supervisor to aid the harassment, such aid must comprise "something more" than the agency relationship itself. *Jin*, 295 F.3d at 342–43 (citing *Ellerth*, 524 U.S. at 760, 762–63, 118 S.Ct. 2257). "Although the [Supreme] Court did not define the exact contours of what that 'something more' would have to be, it did identify one class of cases that clearly satisfies the standard: 'when a supervisor takes a tangible employment action against the subordinate'." *Id.* (quoting *Ellerth*, 524 U.S. at 760, 118 S.Ct. 2257).

In *Ellerth*, the Court noted that a tangible employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." 524 U.S. at 761, 118 S.Ct. 2257. The list given, however, is non-exhaustive, and the tangible employment action need not have any economic effect at all. *Jin*, 295 F.3d at 344, 348. Also, the action taken does not have to flow from an employee's negative response to harassment either. *Id.* at 345–49. An unlawful tangible employment

action is also taken if the supervisor grants a tangible job benefit based on the submission to demands. *Id.* at 345. Indeed, the Second Circuit in *Jin* reaffirmed a prior vicarious liability decision, imposing automatic liability on an employer "when a supervisor bases decisions affecting terms and conditions of a subordinate's employment on the submission to sexual demands ...," without regard to whether such a decision is favorable or unfavorable to the employee. *Id.* at 349 (reaffirming *Karibian v. Columbia Univ.*, 14 F.3d 773, *cert. denied*, 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994)). Thus, a tangible employment action taken by a supervisor, whether that action gives or takes away a job benefit of the employee, imputes vicarious liability to the employer, and an employer can raise no defense to avoid such liability. *Ellerth*, 524 U.S. at 762, 118 S.Ct. 2257; *Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283, 293–94 (2d Cir. 1999).

Plaintiff has argued that her termination constitutes a tangible employment action, thus imputing automatic vicarious liability to Progressive. Whether a termination constitutes a tangible employment action depends on whether such termination was a culmination of the sexual harassment, or if the plaintiff was fired for another reason. *See Citroner v. Progressive Casualty Ins. Co.*, 208 F.Supp.2d 328, 341 (E.D.N.Y.2002) (stating, "defendant is entitled to rely on *Faragher* and *Ellerth* because, even though plaintiff was terminated, this termination was not the culmination of any harassment against plaintiff"). In the instant case, factual questions remain as to the true reason for plaintiff's termination. She alleges that the hostile work environment Mitchell created coerced her, against her will, into drinking, and that such drinking was used as the reason for her termination. She

alleges that the real reason she was fired was not due to a violation of the office alcohol policy, but rather because she lodged a complaint against Mitchell to Beney, and the company used her violation of the alcohol policy as a convenient means to head off any problems arising from the sexual harassment complaint lodged against Mitchell. Plaintiff alleges, and Mitchell does not deny, that Beney was friends with Mitchell and his wife, citing, among other things, Beney's participation as an usher in Mitchell's wedding. As such, sufficient factual disputes have been raised as to whether or not the termination, in the end, was a culmination, or result, of Mitchell's harassment. *See Lee v. Glessing,* 140 F.Supp.2d 215, 220 (N.D.N.Y.2001) ("In the context of employment discrimination cases, summary judgment is 'ordinary inappropriate because the allegations therein require exploration into an employer's motivation and intent for an employment decision").

Even if plaintiff's termination was not the culmination of Mitchell's sexual harassment, numerous other actions by Mitchell himself could qualify as tangible employment actions. Plaintiff was allegedly on a career track to become an outside road adjuster. Such a position involves significant time out of the office, and is essentially a promotion. Mitchell denied her the opportunity to pursue such an avenue, or at least slowed down the process, by ensuring that plaintiff spent an increasing amount of time in the office with him. This could be found by a jury to significantly hamper, or even eliminate, a tangible job benefit.

Also, according to plaintiff, Mitchell varied and extended plaintiff's working hours, and assigned her work which she was not yet qualified to do. She had to put in many night and weekend hours, alleging she frequently was to be found at work when all other employees at or above her rank and prestige, with the frequent exception of Mitchell, were out of the office. These additional hours and duties were all assigned, according to plaintiff, so as to expand and increase the success of Mitchell's opportunistic efforts to transform their working relationship into a romantic and sexual alliance. Such surplus burdens on her work schedule were based on her responses to his sexual advances, whether such responses were negative or positive. Indeed, as time wore on, and especially after she submitted to his coercion, Mitchell sought to increase their time spent alone and changed her hours and duties accordingly. Thus, these alterations in the otherwise structured working conditions of the claims representative, or even inside process leader, could be found by a jury to be "significant changes" in her employment status. *See Cady v. Cortland,* No. 96–CIV–1229, available at 2000 WL 1456285, at *14 (N.D.N.Y.2000) (finding female police officer's allegations of being denied opportunity to handle disturbance calls, being required to perform more desk duties, not being advised of her schedule in advance, being forced to perform her duties in civilian clothes, and not being allowed to participate in training raised "at least triable issues regarding whether [plaintiff] suffered tangible employment action").

Further, when plaintiff attempted to distance herself from Mitchell, he allegedly responded by not answering her work-related questions, by delaying work projects she was completing, and by refusing to intervene and quell the intra-office hostility between plaintiff and the rest of her co-workers. All these actions mark a significant change in plaintiff's duties and conditions of employment.

There can be little doubt, also, that all of the above actions were performed under the guise of supervisory authority. With

**206**

respect to the termination, the supervisory authority is rather obvious. Beney, and certainly Barbagallo, had the power to significantly affect plaintiff's employment, presumably both by dismissing her or by transferring her. Even if Beney, or Mitchell, could not unilaterally terminate her, sufficient facts have been alleged that would allow a reasonable jury to conclude that either could recommend her firing, and that such recommendation would be followed. *See Hill v. The Children's Village,* 196 F.Supp.2d 389, 396 (S.D.N.Y. 2002) (having authority to recommend termination shows supervisory status). Similarly, Mitchell was in charge of the Utica office. He was plaintiff's boss. He could alter her schedule and duties, as it is alleged he did, as her supervisor. *See id.* (having authority to change an employee's schedule indicates supervisory status). Taking the facts in the light most favorable to plaintiff, the jury could find any of the above actions to constitute a tangible employment action and, thus, hold Progressive automatically liable.

■ Even assuming, *arguendo,* that a tangible employment action was not taken against plaintiff, material factual disputes still remain so as to preclude summary judgment on the Title VII sexual harassment claim. If no tangible employment action is taken by the supervisor, an employer may avoid liability if it can show: "(1) that [it] exercised reasonable care to prevent and correct any sexually harassing behavior, and (2) that [plaintiff] unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher,* 524 U.S. at 807–08, 118 S.Ct. 2275; *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257. The employer bears the burden of persuasion with regards to proving this affirmative defense. *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257.

■ With respect to the first prong, i.e., whether the employer exercised reasonable care in preventing and correcting inappropriate behavior, "the mere existence of a grievance procedure ... coupled with [plaintiff's] failure to invoke that procedure does not serve to insulate an employer from liability on summary judgment." *Robles v. Cox & Co., Inc.,* 154 F.Supp.2d 795, 805 (S.D.N.Y.2001) (quoting *Meritor Savings Bank,* 477 U.S. at 72, 106 S.Ct. 2399). Indeed, merely showing that a plaintiff grasped the employer's management hierarchy, and knew where to direct general complaints, is insufficient to grant an employer's motion for summary judgment. *See, e.g., Bayard v. Riccitelli,* 952 F.Supp. 977, 985 (E.D.N.Y.1997).

Instead, the policy should alert employees to management interest in specifically correcting sexual harassment. *Meritor,* 477 U.S. at 72–73, 106 S.Ct. 2399. Even so, the mere demonstration of the existence of a written sexual harassment policy, though an important consideration, *Faragher,* 524 U.S. at 808, 118 S.Ct. 2275, is in no way dispositive. *Leopold,* 239 F.3d at 245. Such policy must also be reasonably disseminated to the employees. *Hill,* 196 F.Supp.2d at 399 (denying an employer's motion for summary judgment because the plaintiff claimed she did not see the policy until after her termination). In addition, the employer's response to the inappropriate conduct must be effective, which is usually a determination within the province of the jury. *Yerry,* 186 F.Supp.2d at 186 (citing *Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1180–81 (2d Cir.1996)). "If the evidence creates an issue of fact as to whether an employer's action is effectively remedial and prompt, summary judgment is inappropriate." *Id.* (citing *Richardson,* 180 F.3d at 441).

In the instant case, plaintiff alleges she did not know of Progressive's sexual harassment policy, contained in "The Progressive Way." She claims she did not receive it when she went through training near the commencement of her employment in Albany, despite Progressive's claim that all new employees receive it during training and that it provides employees with updated versions in the event policies change. She also denies that she received periodic memoranda on the policy. Though plaintiff admits she received some "box" during training, her supervisor during the training period could not recall whether or not he or anyone else gave plaintiff "The Progressive Way," nor could he recall seeing her with the book. Progressive claims plaintiff took two "exams" in which items from "The Progressive Way" were tested. Though Progressive has submitted a copy of test scores, these copies give only her score. They do not indicate that the test was specifically over the company's sexual harassment policy, nor is the actual test submitted to the court by defendants. Plaintiff admits taking the test for which the scores have been offered, but denies that it was a test on sexual harassment. It is even conceivable that plaintiff could do well on the test without reading "The Progressive Way." Plaintiff does admit to knowing of a document entitled "The Progressive Way," which was a "reference source" in the Albany office, but claims she thought it contained benefits information. A factual dispute as to whether she was aware of the sexual harassment policy alone is sufficient to defeat summary judgment on the affirmative defense.

Further, even if plaintiff did know of the sexual harassment policy specifically, it contains no specific procedure for sexual harassment complaints, aside from the unhelpful advice to contact someone. *See Cady, supra*, at *14 n. 12 (even assuming tangible employment action occurred, factual issue with regards to whether plaintiff knew of policy and fact that employer admitted it had "no set procedure" on how to handle a sexual harassment complaint precluded summary judgment). Progressive claims that its "open door policy" and company "hotline" were both avenues for processing such complaints. The "hotline" does mention its utility for reporting "employee harassment," but also is seemingly applicable to all types of conduct. In the event that an employee feels uncomfortable with either the hotline or the open door policy, he or she may take a complaint straight to the human resources officer. Such avenues of complaint, geared not specifically towards sexual harassment complaints, but instead to any run-of-the-mill behavior an employee deems inappropriate, are insufficient as a matter of law to sustain an employer's burden on the first prong of the affirmative defense.

Yet another avenue mentioned in "The Progressive Way" directs, "[a]t the time you experience or become aware of any threat, assault, harassment or verbal abuse arising out of the work relationship would could affect you or others while at work, you should: (1) Use Progressive's standard emergency procedures as a guideline to ensure your personal safety and/or the safety of others; [and] (2) Report the incident as soon as possible to your manager, HR representative, business unit General Manager, Corporate functional head or Policy Team member. A timely, impartial and thorough investigation of all reported incidents will be conducted." This section goes on to assure an employee that an investigation, complete with interviews and statements, will ensue. This policy simply outlines a general grievance procedure. It is not specific to sexual harassment and, it seems, applies only where violence or a threat to personal safety is involved. The first step it advises an employee to take is to use "emergency procedures" to ensure personal safety. While in the actual lan-

guage there is not an "and" between numbers one and two, neither is there an "or," thus giving rise to a reasonable conclusion that both steps are necessary. Further supporting a reasonable conclusion that this section of "The Progressive Way" is geared towards events giving rise to physical danger is the introductory paragraph, which encourages the reporting of behavior "that may impact [someone's] safety or the safety of other Progressive people while at work." Reasonable minds could conclude that, even if plaintiff had possession of "The Progressive Way," the generalized complaint procedures contained therein are insufficient to carry Progressive's burden on the first prong of its affirmative defense.

Plaintiff admits she knew of Progressive's human resources department, but simple knowledge of an employer's hierarchical structure is not sufficient, and pursuing her claim through that channel would have made no difference. That is where it ended up anyway. Also, the person alleged to be the central figure in the investigation into plaintiff's complaint Veronica Buttacavoli, had no experience investigating sexual harassment complaints, and had only been working at Progressive for four or five months. And, as plaintiff alleges, and there is sufficient factual support for the notion that, Beney and Barbagallo both participated in the investigation. Beney initiated the investigation, and was kept apprised of its progress, and Barbagallo was not a stranger to the case either. According to plaintiff, Barbagallo became aware of the situation near the beginning of or before the investigation; Progressive has indicated Barbagallo knew of the situation even earlier, approximately a week and a half before the reins were handed over to Buttacavoli. Neither of these two had any tangible experience in dealing with sexual harassment cases. *See Hill,* 196 F.Supp.2d at 399 (finding issue as to inadequate implementation where investigators had insufficient training to recognize sexual harassment).

No Progressive employee part of the investigation had any specific procedures to follow with regards to conducting a sexual harassment investigation, aside from general directions to interview and take statements from people. Human Rights employee Buttacavoli had no experience investigating sexual harassment claims, and, perhaps amazingly, concluded the investigation in four short days. The level of harassment alone and the competing versions of the facts may lead a jury to believe that a four-day investigation would lack depth. Plaintiff has thus contested Progressive's contention that the investigation was effective and adequate, and summary judgment is not the appropriate vehicle for resolving it.

■ Factual questions remain on the second prong of the defense as well. The Second Circuit utilizes a burden-shifting approach with respect to the second prong of the Faragher/Ellerth defense, i.e., whether plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm. *Leopold,* 239 F.3d at 246. The employer bears the initial burden of showing that plaintiff completely failed to utilize the complaint procedures. *Id.* If the employer carries this burden, the burden of production shifts to the plaintiff to demonstrate a reason or reasons as to why such procedures were not utilized. *Id.* The employer is then entitled to rely on the absence or inadequacy of such proffered reason or reasons in carrying its ultimate burden of persuasion. *Id.*

While conclusory allegations of fear of reprisal or repercussions for reporting conduct is insufficient for a plaintiff to carry her burden of production, *Fierro v. Saks Fifth Ave.,* 13 F.Supp.2d 481, 492 (S.D.N.Y.1998), a reluctance to report sex-

ual harassment using the procedures in place may defeat an employer's use of the Ellerth/Faragher affirmative defense if such reluctance is based on a credible fear of what the employer might do in response. *Caridad*, 191 F.3d at 295. This credible fear must be based on more than a plaintiff's subjective belief. *Leopold*, 239 F.3d at 246.

Here, Progressive has alleged that plaintiff completely failed to utilize its complaint procedures. As noted, Progressive had no actual complaint procedure specific to sexual harassment. This alone may be enough to defeat summary judgment. Nonetheless, it is reasonable to conclude that the plaintiff going to Beney with her complaint is consistent with Progressive's open door policy. Surely Progressive is not insinuating that the plaintiff was required to go to the "open door" of Mitchell, the perpetrator of the harassment. It could even be argued, however, that she did go to Mitchell in a way consistent with the policy. She voiced her objections to Mitchell regarding his behavior. He knew of her reservations regarding her conduct. Even if plaintiff did not utilize the open door policy in a way consistent with Progressive's intent, the inherent vagaries in such a policy can effectively usurp its intended purpose of covering any and all grievances.

Moreover, it can be argued that Beney, by not insisting she follow the vague and broad standards set out in "The Progressive Way" in their initial meeting, may have opened up a new complaint procedure for plaintiff. Even though he may have advised her of the different grievance procedures Progressive had instituted to deal with complaints, he still went ahead and initiated the investigation. This is not to suggest that an employer should ignore an employee's sexual harassment complaint when they become aware of it simply because that employee did not follow the procedure precisely as it is set forth in its manual. It is axiomatic to simultaneously contend, however, that strict adherence to written grievance procedures is absolutely essential, and that investigations arising out of other, unwritten avenues of complaint were flawlessly conducted. If the latter were correct, why would an employer require an employee to go through the formal channels, especially when those formal channels are vague and may process and investigate claims with less speed and ferocity. A formal complaint procedure specific to sexual harassment may eliminate this issue, but such is not present here.

Even if Progressive could show that the plaintiff completely failed to utilize complaint procedures it had in place, summary judgment is still inappropriate because the plaintiff's fear of repercussions or retaliation if she was to report the complaint could be found by the jury to be credible. As discussed above, Mitchell and Beney were close. It is reasonable for plaintiff, and any other person in her position, to believe Mitchell's threats that Beney would side with Mitchell and that she would be the one detrimentally affected if a complaint were lodged. Moreover, the fact that the harassment began approximately eight months before she reported the harassment is not alone dispositive, and, in fact, is reasonably explained by her fear of retaliatory termination and the financial insecurity such termination would bring with it.[5]

---

5. The time lapse could also be explained by her lack of knowledge that such conduct was actionable harassment at first. *See* John H. Marks, *Smoke, Mirrors, and the Disappearance of "Vicarious Liability": The Emergence of a*

*Dubious Summary Judgment Safe Harbor for Employers Whose Supervisory Personnel Commit Hostile Environment Workplace Harassment*, 38 Hous.L.Rev. 1401, 1405, 1429 (2002) (stating that courts treat delays in com-

## 2. Progressive's Liability under NYHRL

■ As noted, the analysis under Title VII and NYHRL differs in terms of employer liability for the unlawful conduct of employees.[6] *See Dyke,* 79 F.Supp.2d at 102. It has been well documented, by both federal courts within the Second Circuit and by New York state courts, that employer liability under NYHRL is not judged under *respondeat superior,* but instead requires a more stringent showing, in particular, that the employer had knowledge of and acquiesced in, or subsequently condoned, the discriminatory conduct.[7] *See Torres v. Pisano,* 116 F.3d 625, 629 n. 1 (2d Cir.1997); *Hill,* 196 F.Supp.2d at 401; *Ponticelli v. Zurich American Ins. Group,* 16 F.Supp.2d 414, 433 (S.D.N.Y. 1998); *Kolp v. New York State Office of Mental Health,* 15 F.Supp.2d 323, 326 (W.D.N.Y.1998); *See also State Division of Human Rights ex rel. Greene v. Saint Elizabeth's Hosp.,* 66 N.Y.2d 684, 687, 496 N.Y.S.2d 411, 487 N.E.2d 268 (1985); *Brennan v. Metropolitan Opera Ass'n,* 284 A.D.2d 66, 729 N.Y.S.2d 77, 85–86 (N.Y.App.Div.2001) (First Department); *Lewis v. Bryan,* 270 A.D.2d 234, 704 N.Y.S.2d 837 (N.Y.App.Div.2000) (Second Department); *Grand Union Co. v. Merca-do,* 263 A.D.2d 923, 694 N.Y.S.2d 524, 526 (N.Y.App.Div.1999) (Third Department); *Community Action Organization of Erie Cty., Inc. v. Mercado,* 261 A.D.2d 935, 689 N.Y.S.2d 807, 808 (N.Y.App.Div.1999) (Fourth Department).

■ Though this standard is said to somewhat mirror the mandates of the Second Circuit prior to *Faragher* and *Ellerth,*[8] an employer, in order to incur liability under NYHRL, must become "a party to [an employee's discriminatory conduct] by encouraging, condoning, or approving it." *Ponticelli,* 16 F.Supp.2d at 433 (quoting *Saint Elizabeth's Hospital,* 66 N.Y.2d at 687, 496 N.Y.S.2d 411, 487 N.E.2d 268). "Condonation ... contemplates a knowing, after the fact forgiveness or acceptance of an offense. An employer's calculated inaction in response to discriminatory conduct may, as readily as affirmative conduct, indicate condonation." *Father Belle Community Center v. State Division of Human Rights ex rel. King,* 221 A.D.2d 44, 642 N.Y.S.2d 739, 746 (N.Y.App.Div.1996). An employer may disprove condonation by showing that it reasonably investigated the complaint of unlawful harassment and took corrective action. *Vitale,* 727 N.Y.S.2d at 218.

plaining "as something akin to contributory negligence," and warning of the judicial tendency to ignore the *Ellerth* requirement that courts determine also how much harm a reasonable person would have avoided in plaintiff's position).

6. The New York Court of Appeals has yet to determine whether they will follow the *Ellerth* and *Faragher* guidelines regarding employer vicarious liability. *See Vitale v. Rosina Food Prod., Inc.,* 283 A.D.2d 141, 727 N.Y.S.2d 215, 219 (N.Y.App.Div.2001).

7. There is the somewhat odd possibility that a sexual harassment claim under Tittle VII may survive summary judgment, while its counterpart under NYHRL may not. *Rivera, supra,* at *12 (denying summary judgment on issue of employer liability under Title VII, but granting it under NYHRL).

8. Under federal law, prior to *Ellerth* and *Faragher,* in order to impute liability to an employer, the Second Circuit required a plaintiff to demonstrate one of the following four: (1) that the supervisor was at a sufficiently high level in the company; (2) that the supervisor used his actual or apparent authority to further the harassment, or was otherwise aided in committing the harassment by the existence of the agency relationship; (3) that the employer provided the victimized employee with no reasonable avenue of complaint; or (4) the employer knew or should have known of the harassment but unreasonably failed to stop it. *See Torres,* 116 F.3d at 634.

Even with the heightened standard of imputing liability, summary judgment is still inappropriate on plaintiff's NYHRL sexual harassment claim against Progressive. Factual issues remain for the jury's determination as to whether Progressive subsequently, in effect, condoned Mitchell's sexual harassment by allegedly conducting its investigation in an ineffective and inadequate manner, whether such a manner of investigation may have resulted from the investigator's or investigators' lack of experience or from Mitchell and Beney's close ties, and whether the consequent agreement with Mitchell's side of the story flowed from and was tainted by such ties. *See Hill,* 196 F.Supp.2d at 401 (finding factual issues as to whether condonation occurred where results of investigation may have been "foregone conclusion" due to harasser and investigator's close relationship). In short, factual issues as to the reasonableness of the investigation, based on the above factors, and as discussed in part, *supra,* preclude summary judgment.

## C. *Retaliation*

In plaintiff's *third* and *sixth* causes of action, she alleges her termination was a direct result of her complaints to defendants about Mitchell's behavior, in violation of the anti-retaliation provisions of both Title VII, 42 U.S.C. § 2000e–3(a), and NYHRL, § 296(3–a)(c). As was the case with plaintiff's sexual harassment claims, the substantive contours of plaintiff's retaliation claims are determined by the same standards under Title VII and NYHRL. *Tomka,* 66 F.3d at 1305 n. 4. In order to make out a prima facie case for retaliation, plaintiff is required to demonstrate that she: (1) engaged in a protected activity known to Progressive; (2) suffered an adverse employment action; and (3) a causal connection exists between participation in the protected activity and the adverse employment action. *Gregory,* 243 F.3d at 700; *Quinn,* 159 F.3d at 769.

"Protected activities" include not only the filing of formal charges of discrimination, but also more informal objections of unlawful discrimination, such as making complaints to management, so long as the employee has a good faith, reasonable belief that the actions being challenged did violate anti-discrimination laws. *Matima v. Celli,* 228 F.3d 68, 78 (2d Cir. 2000); *Sumner v. United States Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990). There can be little doubt that the plaintiff's lodging of a sexual harassment complaint to Beney is well within the definition of "protected activity"; thus, plaintiff has satisfied the first element of her prima facie case of retaliation.[9] Similarly, as plaintiff was terminated, there is no dispute that she suffered an "adverse employment action." *See Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) ("A materially adverse change might be indicated by a termination of employment").[10]

The element of the plaintiff's prima facie case upon which the parties significantly differ is whether there exists a causal connection between the lodging of

**9.** Plaintiff's only activity falling anywhere near the definition of "protected activity" is the lodging of the sexual harassment complaint to Beney.

**10.** The plaintiff could not have alleged a deficiency in Progressive's complaint procedure, or its subsequent investigation, "even if the deficiency is little more than an attempt to strengthen an employer's defense," as constituting an adverse employment action under the retaliation provision. *See O'Dell v. Trans World Entertainment Corp.,* 153 F.Supp.2d 378, 396 (S.D.N.Y.2001) (relying upon *United States v. New York City Transit Auth.,* 97 F.3d 672, 677 (2d Cir.1996).

the complaint and her termination. A causal connection may be established either *"indirectly* by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or *directly* through evidence of retaliatory animus directed against a plaintiff by the defendant." *Martin v. New York State Dept. of Correctional Serv.,* 115 F.Supp.2d 307, 311 (N.D.N.Y.2000) (quoting *Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991) (emphasis in original)).

■ While the Second Circuit, when confronted with retaliation actions, has declined "draw[ing] a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," *Gorman–Bakos v. Cornell Coop. Extension of Schenectady Cty.,* 252 F.3d 545, 554 (2d Cir.2001) (holding, however, that a five month gap between protected speech and retaliatory action was not too long to support causal inference in § 1983 retaliation action), courts have readily found a showing of temporal proximity between a protected activity and an adverse employment action to merit the inference of a causal connection sufficient to defeat an employer's motion for summary judgment. *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 224 (2d Cir.2001) (allowing causal inference to be drawn where plaintiff was suspended within a month after her complaint was served on the employer); *Cifra v. General Electric Co.,* 252 F.3d 205, 217 (2d Cir.2001) (allowing inference to be drawn where termination occurred twenty days after plaintiff retained attorney to pursue her gender discrimination claim); *Quinn,* 159 F.3d at 769 (allowing inference to be drawn where gap was two months); *Reed,* 95 F.3d at 1178 (allowing inference to be drawn where twelve days elapsed between complaint and termination); *Petrosky v. New York State Dept. of Motor Vehicles,* 72 F.Supp.2d 39, 62 (N.D.N.Y. 1999). In accordance with this weight of authority, the six to seven-day span between the time plaintiff complained to Beney and the time she was terminated is adequate at the summary judgment stage to support an inference of a causal connection.

■ If the plaintiff succeeds in demonstrating her prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for taking the adverse employment action. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Progressive, by alleging it terminated the plaintiff because she violated office policy by consuming alcohol on company premises, has satisfied its burden of production.

■ Where the defendant is able to satisfy its burden of production, the burden shifts back to the plaintiff to show that the defendant's proffered justification is merely a pretext for retaliation and that the adverse employment action taken by the defendant was actually motivated by a retaliatory motive. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–12, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). To survive summary judgment, a plaintiff need not show that a retaliatory motive was *the* factor driving the adverse employment action; she need only show it was *a* factor. *Ramos v. Marriott Intern., Inc.,* 134 F.Supp.2d 328, 347 (S.D.N.Y.2001) (quoting *Padilla v. Metro–North Commuter R.R.,* 92 F.3d 117, 122 (2d Cir.1996); *Dominic v. Consol. Edison Co.,* 822 F.2d 1249, 1254 (2d Cir.1987)).

■ Plaintiff has raised sufficient factual issues so as to preclude summary judgment on whether the firing resulted from the violation of the office alcohol policy or in retaliation for her making the

sexual harassment complaint against Mitchell. As plaintiff points out, if violating the policy justified mandatory termination, and if plaintiff indicated she had violated the policy, there seems to be little reason as to why Beney did not discharge her on the spot. There would seem to be even less reason for Beney to direct plaintiff to Florida for more training. Doing this would make little sense if it was mandatory to fire her. Progressive does contend it did not learn of the alcohol violation until the September 18th meeting in which it was determined that no sexual harassment occurred and that plaintiff would be terminated. Taking the facts in the light most favorable to plaintiff, however, it must be assumed that Beney learned of the violation prior to this time. In any event, the dispute give rises to a factual question as to when Progressive learned of the violation. Without resolution of such a factual question, summary judgment is inappropriate.

Progressive points to an analogous alcohol policy, one prohibiting Progressive employees from consuming alcohol before operating Progressive vehicles, and alleges it has "even fir[ed] an employee for the consumption of a single alcoholic beverage on New Year's Eve." While Progressive's concern for the safety of drivers and pedestrians alike on a holiday infamous for its festive celebration is laudable, it provides no support for their position, and, in fact, seems to do the opposite. If Progressive is going to fire an employee for an even slight deviation such as the one mentioned, surely the more rampant and continuous violation of plaintiff deserved immediate termination.

In addition, plaintiff has produced the termination notifications issued to Mitchell and plaintiff. Neither form contains the reason for the terminations and, in fact, the space specifically reserved for desig-

nating the reason, called the "reason code," was left blank on both forms.

## D. *Aiding and Abetting Under the NYHRL*

In plaintiff's *seventh* cause of action, she alleges that defendants Mitchell, Beney, and Barbagallo are personally liable for violating the "aiding and abetting" section, § 296(6), of the NYHRL. That section makes it an unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [the NYHRL], or attempt to do so. N.Y.Exec.Law § 296(6). Plaintiff claims that Mitchell aided and abetted the alleged sexual harassment violation, and that Beney and Barbagallo incur liability not only for aiding and abetting in the alleged sexual harassment of and retaliation against the plaintiff, but also for "their participation in the sham investigation of plaintiff's complaint."

While employees escape individual liability under the general discrimination provision of the NYHRL, N.Y.Exec.Law § 296(1), "a defendant who actually participates in the conduct giving rise to a discrimination claim may be held personally liable under [§ 296(6), the aiding and abetting provision]." *Hasbrouck v. Bankamerica Housing Serv., Inc.,* 105 F.Supp.2d 31, 39 (N.D.N.Y.2000) (quoting *Tomka,* 66 F.3d at 1317). "In order to hold an individual liable under [the aiding and abetting provision], however, plaintiff must also show that the individual aided or abetted 'a primary violation of the [NY]HRL committed by another employee *or the business itself'.*" *Rivera, supra* (quoting *McIlwain v. Korbean Int'l Investment Corp.,* 896 F.Supp. 1373, 1383 (S.D.N.Y.1995)) (emphasis added).

An argument can be made, and indeed has been alluded to, that Mitchell, Beney, and Barbagallo, as primary actors

in the alleged sexual harassment and retaliatory discharge, cannot be liable under § 296(6) because they cannot aid and abet their own actions. Some courts have agreed. *See, e.g., DeWitt v. Lieberman,* 48 F.Supp.2d 280, 294 (S.D.N.Y.1999); *Falbaum v. Pomerantz,* 891 F.Supp. 986 (S.D.N.Y.1995). Others, following *Tomka,* have not, *see, e.g., Hasbrouck,* 105 F.Supp.2d at 39; *Lewis v. Triborough Bridge and Tunnel Authority,* 77 F.Supp.2d 376, 382 n. 7 (S.D.N.Y.1999), including some New York state courts, causing a split among appellate divisions. *See Steadman v. Sinclair,* 223 A.D.2d 392, 636 N.Y.S.2d 325, 326 (1st Dept.1996) (following *Tomka* ); *but see Trovato v. Air Express Int'l,* 238 A.D.2d 333, 655 N.Y.S.2d 656 (2d Dept.1997) (declining to follow *Tomka* ). Perhaps the most elegant description of the logical conundrum created by the holding in *Tomka* was set forth by the court in *Perks v. Town of Huntington:*

> The Second Circuit apparently disagrees [with the notion that one cannot be liable as an aider and abettor because one cannot aid and abet his or her own actions]. In *Tomka,* plaintiff "alleged that each of the individual defendants assaulted her and thereby created a hostile work environment." The court held that that allegation was "sufficient to satisfy § 296(6)." Perhaps the rationale behind the court's decision was that each of the three individual defendants were aiding and abetting their fellow defendants' violations. If this is true, individuals may not be liable under *Tomka* for aiding and abetting their own violations of the [NY]HRL. Perhaps the rationale behind the decision was that the employees' actions imposed liability on the employer and therefore the employees were aiding and abetting the employer's violation of the [NY]HRL, and not their own. We must wait for the Second Circuit to revisit the issue so that we may gain a firmer understanding of its rationale in *Tomka* and better understand the intended breadth of its application.

96 F.Supp.2d 222, 228 n. 2 (E.D.N.Y.2000) (internal citations omitted). Because the New York Court of Appeals has yet to resolve the issue, *Tomka* remains binding precedent,[11] and Mitchell, Beney, and Barbagallo may be personally liable under § 296(6) as aiders and abettors of Progressive's alleged unlawful conduct.

■ Nevertheless, this is not to say that Mitchell, Beney, and Barbagallo incur instant liability. Plaintiff must first prove all of the elements of the substantive discrimination claims, in this case, either retaliation or sexual harassment, and that the individual defendants actually participated in the discrimination. *Beattie v. Guilderland Central School District,* 124 F.Supp.2d 802, 805 (N.D.N.Y.2000) (citing *Tomka,* 66 F.3d at 1317). As noted, material factual questions, that must be decided

---

**11.** It should be noted that *Rivera, supra,* held that an individual defendant could not have aided and abetted his own action. This is distinguishable, insofar as the court's ultimate holding, from the instant case. In *Rivera,* there was only one defendant who directly participated in the violation of the NYHRL, and the plaintiff's NYHRL claims against the employer had been dismissed. Since the claim for violation of the substantive provision of NYHRL was directed at the employer, and not the employee, it was logical that the employee could not be held liable, namely because he could only aid and abet the employer's conduct. *See Lewis,* 77 F.Supp.2d at 383 (acknowledging that because plaintiffs could not establish employer liability in *Rivera,* individual defendants could not be held liable as aiders and abettors). In this case, since all substantive violations of the NYHRL have been dismissed against the individual defendants, and such claims remain only as against Progressive, the claim is necessarily that Mitchell, Beney, and Barbagallo have aided and abetted in Progressive's violation of the NYHRL, and not their own.

by the jury, preclude a determination as a matter of law as to whether the elements of the substantive NYHRL violations have been met. With respect to the sexual harassment claim, it is not disputed that Mitchell "actually participated" in the alleged sexual harassment, and plaintiff has raised at least a factual issue as to whether Beney and Barbagallo participated in the investigation.[12] Reasonable minds could conclude that Beney and Barbagallo initiated the investigation, and were kept apprised of the progress. Barbagallo contends he was not "personally involved" in the investigation, but plaintiff has presented sufficient evidence so that the determination is properly reserved to the jury, not the court. Further, it is admitted that both were present during a conference call in which Buttacavoli presented her investigation to Progressive executives, and the executives, including Beney and Barbagallo, concluded that no sexual harassment had occurred. With respect to the retaliatory termination claim, at the very least a factual question remains as to whether Beney and Barbagallo "actually participated" in the decision to discharge plaintiff. Whether such participation was wrongful is for the jury to decide, and is not a matter for the court on summary judgment.

### E. *Overtime Compensation*

■ In plaintiff's *ninth* and *tenth* causes of action, she alleges being owed compensation for overtime worked pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207, and the New York Labor Law § 663. Because neither plaintiffs nor defendants direct this court to authority mandating a different analysis under New York State law and the FLSA,

"the ensuing analysis focuses solely on federal law, but applies equally to Plaintiff's claims under the FLSA and New York State law." *Debejian v. Atlantic Testing Laboratories, Ltd.,* 64 F.Supp.2d 85, 87 n. 1 (N.D.N.Y.1999) (further finding that "[r]eview of New York State regulations at 12 N.Y.R.C.R.R. Part 142 reveals that they are substantially similar to the federal scheme.") (internal citations omitted).

■ As there is no dispute that Progressive falls within the purview of the FLSA, it is required to pay its employees overtime wages, at the rate of time and a half, for any hours worked over forty in a single week. *See* 29 U.S.C. § 207. This duty to pay, however, is not automatic. Congress has expressly provided for several exemptions, covering classes of employees, to an employer's duty to pay overtime compensation. *See* 29 U.S.C. § 213. These exemptions are narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit," *Bilyou v. Dutchess Beer Distributors, Inc.,* 300 F.3d 217, 222 (2d Cir.2002) (quoting *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960)), with the burden of establishing such applicability resting squarely upon the employer's shoulders. *Idaho Sheet Metal Works, Inc. v. Wirtz,* 383 U.S. 190, 206, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966).

Among the exemptions from the duty to pay overtime is for those employees who are "employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). The Department of Labor has issued regulations and interpretations regarding this exemption (hereinaf-

---

12. For the purposes of this motion only, it is assumed that the investigation is part of the sexual harassment, since factual issues remain as to whether the manner in which the investigation was carried out, in effect, signaled Progressive's condoning of Mitchell's conduct, and, therefore, becoming a party to it.

ter referred to as "the administrative exemption").[13] In making a determination as to whether an employee fits into the administrative exemption, the regulations mandate satisfactory establishment of both a "salary test" and a "duties test." 29 C.F.R. § 541.2(e)(2). Because there is no dispute that plaintiff is paid a regular salary and that such salary exceeds $250 per week, the salary test is satisfied, and the "duties test" applied in this case is commonly referred to as a "short test." Under the short test, an employer must establish that: (1) an employee's "primary duty consists of either the "performance of office or nonmanual work directly related to the management policies or general business operations of the employer or the employer's customers," and (2) "the performance of such duty includes work requiring the exercise of discretion and independent judgment." 29 C.F.R. § 541.214(a); *Ahern v. State of New York*, 807 F.Supp. 919, 925 (N.D.N.Y.1992).

### 1. Administrative Exemption Prong One: "Directly related to management policies or general business operations"

With respect to the first prong of the short test, work "directly related to management policies or general business operations" describes work "relating to the administrative operations of a business." 29 C.F.R. § 541.205(a). *Ahern*, 807 F.Supp. at 925. "The administrative operations of the business include the work performed by so-called white-collar employees engaged in 'servicing' a business as, for example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." 29 C.F.R. § 541.205(b). Courts have interpreted "servicing" the employer to mean work "ancillary to an employer's principal production activity." *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 905–05 (3d Cir. 1991).

These administrative activities must also be an employee's "primary duties." While the regulations suggest the yardstick of 50% or more of an employee's time for determining an employee's primary duty, time alone is not dispositive. *Cooke v. General Dynamics Corp.*, 993 F.Supp. 56, 59 (D.Conn.1997). "Under the short test, the employee's 'primary duty' will usually be what he or she does that is of principal value to the employer, not the collateral tasks that he or she may also perform, even if they consume more than 50% of his or her time." *Id.* (citing *Dalheim v. KDFW–TV*, 918 F.2d 1220, 1227 (5th Cir. 1990); *Spinden v. GS Roofing Products Co.*, 94 F.3d 421, 426–27 (8th Cir.1996), *cert. denied*, 520 U.S. 1120, 117 S.Ct. 1254, 137 L.Ed.2d 334 (1997)). Factors to consider in this regard are the relative value of the administrative duties performed, as compared to other ancillary tasks, the frequency with which the employee exercises discretion, the employee's freedom from supervision when performing work activities, and the correlation between the employee's salary and the wages paid to other employees for the non-exempt work. *Id.* (citing *Spinden*, 94 F.3d at 427).

---

**13.** These regulations are entitled to great weight and have even been held to carry the force and effect of law. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 139, 65 S.Ct. 161, 89 L.Ed. 124 (1944). Interpretive guidelines, however, which seek to clarify or supplement regulations, do not carry the force of law, though they should be viewed as persuasive authority since they "constitute a body of experience and informed judgment to which the courts and litigants may properly resort for guidance." *Reich v. Southern New England Telecommunications Corp.*, 121 F.3d 58, 65 (2d Cir.1997) (disagreeing with Department of Labor's interpretation of "work" excluding meal periods).

While "administrative activities" are included within the exemption's coverage, the regulations dictate that "production" work is not. 29 C.F.R. § 541.205(a). Production work is work that "constitutes the primary mission of the enterprise." *Ahern*, 807 F.Supp. at 925. The concept of production is not restricted to its commonly used manufacturing vernacular. *Id.* at 926. Rather, the distinction as to coverage under the exemption is "between those employees whose primary duty is administering the business affairs of the enterprise from those whose primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to produce and market." *Id.* (quoting *Dalheim*, 918 F.2d at 1230). As is necessarily implicated, the nature of the employer's business must be identified in order to ascertain whether an employee's work consisted of production work or administrative activities. *Scott Wetzel Serv., Inc. v. New York State Board of Industrial Appeals*, 252 A.D.2d 212, 682 N.Y.S.2d 304, 305 (N.Y.App.Div.1998) (citing *Martin*, 940 F.2d at 903).

In addition to demonstrating that an employee's work is "administrative," and not just production work, an employer also needs to show that an employee's work is "of substantial importance to the management or operation of [its] business," or that such work is of substantial importance to its customers. 29 C.F.R. § 541.205(a). For work to have substantial importance, it need not be done only by those responsible for creating management policies, or those who operate the business as a whole. 29 C.F.R. § 541.205(c). Instead, persons whose work affects policy, or whose responsibility it is to implement policy, are said to perform work of substantial importance. *Id.* Even employees who work only in a "particular segment of the business," but such work "affects the business operations to a substantial degree," perform work of substantial importance. *Id.*

## 2. *Administrative Exemption Prong Two: "Exercise of discretion and independent judgment"*

With respect to the second prong of the administrative exemption, Progressive must prove that plaintiff's performance of substantially important administrative activities also involved the exercise of discretion and independent judgment. 29 C.F.R. § 541.205(a). "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.207(a). This is not to say to be confused with an employee's "use of skill in applying techniques, procedures or specific standards." 29 C.F.R. § 541.207(b). Rather, an employee is exercising discretion and independent judgment when he or she "has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance," 29 C.F.R. § 541.207(a), though the decisions made as a result of the exercise of discretion need not be the actual taking of action; they can instead be recommendations for action. 29 C.F.R. § 541.207(e)(1). The regulations cite many examples of individuals, such as inspectors, examiners, and graders, who do not exercise independent judgment, instead just applying established and specific standards in assessing situations faced at work.

## 3. *Application*

■ Despite this wealth of legal guidance on Progressive's duty, or non-duty, to compensate plaintiff for her alleged overtime worked, summary judgment is not appropriate. Progressive contends that a letter from the Department of Labor indicating that Progressive's claims represen-

tatives working out of the Tampa, Florida office were, in the opinion of the Department of Labor representative, exempt. This opinion is not offered as to the Utica employees and, even if it were, it is not binding on this court. Whether an employee is exempt is determined by work they actually do, not by an employer's characterization. *Cooke*, 993 F.Supp. at 60. Although the final decision as to whether plaintiff's duties and activities qualify her for the administrative exemption is a legal one, to be made by a court, such a decision is necessarily premised upon factual findings regarding precisely what those duties and activities comprise, and whether performance of such duties involved discretion and independent judgment. *Holzapfel v. Town of Newburgh*, 145 F.3d 516, 521 (2d Cir.1998) (stating that eligibility for overtime compensation is mixed question of law and fact); *Jarrett v. ERC Properties, Inc.*, 211 F.3d 1078, 1081 (8th Cir.2000) (citing *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986)). As one court so aptly put it, "in the end, deciding whether an employee is exempt must be a voyage through fact-bound waters. Although there are a great many stars of law to navigate by, the course turns on the facts of an employee's job duties." *Harris v. District of Columbia*, 741 F.Supp. 254, 256 (D.D.C.1990).

Plaintiff claims, among other things, her duties were not directly related to the management or business operations of Progressive, that her duties were not of substantial importance to Progressive, that she did not exercise a tangible amount of discretion in performing her duties, and that Progressive's primary business function was processing claims under automobile insurance policies, which plaintiff did. Progressive claims essentially the opposite, that, as claims representative and an inside process leader, plaintiff's duties were directly related to the management

and operation of its business, that such duties involved discretion and independent judgment and were of substantial importance to its management and operation, and that Progressive's primary business function was creating and selling insurance policies, which plaintiff did not do.

The legal determination as to whether the exemption applies in this case is premised on several factual considerations. At the very least, the following must be determined before the legal question of whether the administrative exemption applies can be answered: (1) the nature and extent of plaintiff's work, including what constitutes her "primary duties"; (2) the importance this work has to Progressive; (3) what constitutes Progressive's primary business function; and (4) whether or not plaintiff's performance of such duties involved discretion and independent judgment. These are factually-intensive inquiries not appropriate for resolution at the summary judgment stage. *See, e.g., Ahern*, 807 F.Supp. at 926 (finding factual questions as to whether employees' work was administrative or production-related precluded legal resolution of applicability of exemption); *see also Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120 (9th Cir.2002) (stating that it is impossible to determine if an employee's work falls under the administrative exemption without the fact finder first determining the nature of the employee's work activities); *Fife v. Harmon*, 171 F.3d 1173, 1176 (8th Cir.1999) (refusing to grant summary judgment due to factual discrepancies involving nature of and time spent on employee's duties); *Cooke*, 993 F.Supp. at 63 (finding factual discrepancies between employer and employee regarding what employee's primary duties were and whether employee exercised discretion and independent judgment precluded summary judgment); *McGrath v. City of Philadelphia*, 864 F.Supp. 466, 489 (E.D.Pa.1994) (denying summary judgment where factual

dispute existed as to employee's primary duty).

## IV. *CONCLUSION*

For the foregoing reasons, viewing the facts in the light most favorable to plaintiff, genuine issues of material fact remain as to whether to impute liability to Progressive for sexual harassment under both Title VII and New York State law, as to whether plaintiff's termination from her job with Progressive was in retaliation for lodging a sexual harassment complaint against Mitchell to Beney, as to whether Mitchell, Beney, and Barbagallo can be held personally liable for aiding and abetting a violation of NYHRL, and as to whether plaintiff is entitled to overtime compensation or exempt from the statutes dictating the payment of such compensation.

Accordingly, and upon the stipulations of plaintiff, it is

ORDERED that

1. Defendants', The Progressive Corporation, Progressive Casualty Insurance Corporation, Michael Beney, John Barbagallo, and Larry Mitchell, motions for summary judgment are GRANTED in part and DENIED in part;

2. Defendants', The Progressive Corporation and Progressive Casualty Insurance Company, motion for summary judgment on plaintiff's *first, second, third, fourth, fifth, sixth, ninth* and *tenth* causes of action is DENIED;

3. Defendants', The Progressive Corporation and Progressive Casualty Insurance Company, motion for summary judgment, as it pertains to plaintiff's *eighth* cause of action, for intentional infliction of emotional distress, is GRANTED, and that cause of action is DISMISSED;

4. Defendants', Larry Mitchell, John Barbagallo, and Michael Beney, motions for summary judgment on plaintiff's *sev-*

*enth* cause of action, for aiding and abetting, a New York Human Rights Law violation, is DENIED; and

5. Defendants', Larry Mitchell, John Barbagallo, and Michael Beney, motions for summary judgment, as they pertain to plaintiff's *first, second, third, fourth, fifth, sixth,* and *eighth* causes of action, are GRANTED, and these causes of action are DISMISSED.

The remaining causes of action are the *first, second, third, fourth, fifth, sixth, ninth,* and *tenth* against defendants The Progressive Corporation and Progressive Casualty Insurance Company, and the *seventh* against defendants Larry Mitchell, John Barbagallo, and Michael Beney.

IT IS SO ORDERED.